IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALAN MOORE,

      Plaintiff,

                              3:16-CV-886-PK

v.

                              FINDINGS AND
                              RECOMMENDATION

GULF ATLANTIC PACKAGING CORP.,
GULF SYSTEMS, INC., JEFF CUTSHALL, and
CAROL CUTSHALL,

      Defendants.

PAPAK, Magistrate Judge:

      Plaintiff Alan Moore filed this action against defendants Gulf Atlantic Packaging

Corporation ("GAPCO"), Gulf Systems, Inc. ("GSI"), Jeff Cutshall ("Jeff" or "J. Cutshall"), and

Carol Cutshall ("Carol" or "C. Cutshall" and, collectively with Jeff, the "Cutshalls") in the

Multnomah County Circuit Court on April 19, 2016.  By and through his complaint, Moore

alleges that at material times he was employed jointly by GSI and its affiliate, third party Gulf

Packaging, Inc. ("GPI"), as a sales representative, serving GSI and GPI (each a Texas corporation

with its principle place of business in Texas and with no permanent business presence in Oregon)

in Oregon and part of Washington.  Moore further alleges that the Cutshalls (each, a citizen of

Page 1 - FINDINGS AND RECOMMENDATION

Texas) were at all material times the principles of GSI and among the principals of GPI, and that
GAPCO (a Georgia corporation with its principal place of business in Georgia and no permanent
business presence in Oregon) is the successor-in-interest of GPI. Moore further alleges that at
the time GSI terminated his employment, GSI and GPI owed him nearly $90,000 in unpaid
commissions, that he has made repeated demands on defendants for payment of those unpaid
commissions without success, and that those commissions remain unpaid at this time. Arising
out of the foregoing, Moore alleges all defendants' liability under Oregon wage and hour law for
unpaid wages and for failure to pay all wages due and owing in connection with the termination
of his employment, and seeks award of $86,824.17 in unpaid wages/commissions, $27,691.20 as
a waiting-time penalty, and his attorney fees and costs, as well as the court's declaration that the
Cutshalls are jointly liable with GAPCO and GSI for those damages. The defendants removed
Moore's action to this court effective May 20, 2016, on the basis of diversity jurisdiction.

Now before the court are defendant GAPCO's motion (#4) to dismiss for lack of personal
jurisdiction and/or for improper venue and defendants GSI and the Cutshalls' motion (#6) to
dismiss for lack of personal jurisdiction or alternatively to transfer venue. I have considered the
motions, oral argument on behalf of the parties, and all of the pleadings and papers on file. For
the reasons set forth below, GAPCO's motion (#4) to dismiss should be denied in its entirety,
defendants GSI and the Cutshalls' motion (#6-1) to dismiss for lack of personal jurisdiction
should be denied as to GSI and granted as to the Cutshalls, defendants GSI and the Cutshalls'
alternative motion (#6-2) to transfer venue should be denied, and Moore's claims should
accordingly be dismissed without prejudice to the extent alleged against either or both of the
Cutshalls.

# LEGAL STANDARDS

## I.    Motion to Dismiss for Lack of Personal Jurisdiction

A motion to dismiss for lack of personal jurisdiction is governed by Federal Civil Procedure Rule 12(b)(2).  *See* Fed. R. Civ. P. 12(b)(2).  "In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper."  *Boschetto v. Hansing,* 539 F.3d 1011, 1015 (9th Cir. 2008), *citing Sher v. Johnson,* 911 F.2d 1357, 1361 (9th Cir. 1990).  In evaluating the defendant's motion, "[t]he court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues."  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001), *citing Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). If the court decides the motion based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, "the plaintiff need make only a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss."  *Id.*, *quoting Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  In the absence of such an evidentiary hearing, the court accepts uncontroverted allegations contained within the plaintiff's complaint as true, and resolves conflicts between statements contained within the parties' affidavits in the plaintiff's favor.  *See id.*

In the event that plaintiffs avoid a motion to dismiss for lack of personal jurisdiction by making only a *prima facie* showing of jurisdictional facts, personal jurisdiction over each defendant necessarily remains to be established by a preponderance of the evidence at a subsequent, plenary evidentiary hearing.  *See Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977); *see also id.* at n. 2.  Such plenary evidentiary hearing

may be conducted as a pretrial proceeding, in which case the judge sits as the finder of fact and is empowered to weigh the evidence and to make determinations of credibility. *See, e.g., Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004); *see also Data Disc*, 557 F.2d at 1285. In the absence of such a pretrial proceeding, plaintiffs are required to establish personal jurisdiction over each defendant by a preponderance of the evidence at trial. *See, e.g., Data Disc*, 557 F.2d at 1285 n. 2.

## II.    Motion to Dismiss for Improper Venue or to Transfer Venue

A motion to dismiss for improper venue is governed by Federal Civil Procedure Rule 12(b)(3). If the propriety of venue is challenged by a motion brought under Rule 12(b)(3), the plaintiff bears the burden of proving that venue is proper. *See Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). When considering a motion to dismiss for improper venue, a court need not accept the plaintiff's allegations as true and may consider facts outside of the pleadings. *See Doe 1 v. AOL, LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009). Whether to dismiss an action for improper venue, or alternatively to transfer venue to a proper court, is entirely within the discretion of the district court. *See King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992).

## FACTUAL BACKGROUND

## I.    The Parties

Plaintiff Moore is a resident of Oregon. Between January 10, 2011, and April 10, 2015, Moore was employed by defendant GSI (and, according to Moore's allegations, jointly employed by defendant GSI and third party GPI from approximately February 14, 2012, through April 10, 2015) in Oregon as a salesperson compensated on a commission basis.

Defendant GSI was at material times a Texas corporation headquartered in Texas. Defendant Carol and her husband William Cutshall ("William") were GSI's principals and sole shareholders until William's death in or around 2003, following which Carol was GSI's sole shareholder until GSI's dissolution as of May 13, 2016. It appears that, in addition, Carol served GSI at material times as its director of human resources. Defendant Jeff (the son of Carol and William) served as GSI's president from 2003 until GSI's dissolution. It does not appear that GSI ever owned property in Oregon. GSI undisputably conducted business in Oregon by and through Moore's services to it as a salesman; it appears that GSI may have employed other persons in Oregon in addition to Moore, possibly also in sales. It appears that GSI at times operated under the fictitious business name "Gulf Packaging."

Third party GPI was incorporated in Texas on February 14, 2012, to serve as an affiliate of GSI. While GPI was in existence, its shares were 50% owned by an entity affiliated with the Cutshalls and 50% owned by a separate entity (which third party entity owns defendant GAPCO in whole or in part). Jeff and his brother, Bill Cutshall ("Bill"), served on GPI's board of directors. GPI filed for Chapter 11 bankruptcy on April 29, 2015.

Defendant GAPCO is a Georgia corporation headquartered in Georgia. GAPCO purchased some of the assets of Moore's former alleged joint employer, third party GPI, through a Chapter 11 sale of GPI's assets approved by the United States Bankruptcy Court for the Eastern District of Illinois on July 30, 2015. GAPCO also purchased the assets of GSI at some time in or around August 2015. GAPCO had no dealings with Moore at any material time, and maintains no office or place of business or other facility or property in Oregon, has never had employees in Oregon, has never conducted business in Oregon, has never made sales or provided services in

Oregon, and has never solicited customers in Oregon.  Following the purchase of assets from

GPI's estate and from GSI, and continuously thereafter to the present, GAPCO has employed

Carol in its human resources department and has employed Jeff in product sourcing and in sales.

Neither Jeff nor Carol is involved in any way in GAPCO management.

Defendants the Cutshalls are individuals residing in Texas.  Neither Jeff nor Carol has

visited Oregon, and neither Jeff nor Carol has any ties to Oregon other than through Moore's

employment by GSI and/or GPI.  Carol is 73 years old and has health problems that make it

burdensome for her to travel.

## II.    The Parties' Dispute[1]

In late 2010, GSI was experiencing financial difficulties, and the Cutshalls and GSI

approached third party Arman Sarkisian and his business, third party Xsys, Inc., for Sarkisian's

and Xsys' assistance in expanding GSI's business.  GSI entered into a contract with Sarkisian and

Xsys pursuant to which Sarkisian would provide consulting services and Xsys would serve as a

management company for GSI.  Sarkisian identified Moore as a potential sales employee and

offered him a salesman position with a company he referred to in his communications with

Moore as either "Gulf" or "Gulf Packaging."

Moore accepted the offer and on or around January 10, 2011, Moore and GSI entered into

a Sales Employment Agreement (the "Employment Contract") pursuant to which Moore would

sell products for GSI and/or its affiliates in Oregon and part of Washington, and would be

---

[1] Except as otherwise indicated, the following recital of facts reflects my presumption
that all of the facts alleged in plaintiffs' complaint are true and accurate, and additionally
construes the parties' evidentiary submissions in light of the legal standard governing motions to
dismiss for lack of personal jurisdiction.

compensated for his services on a commission basis. The Employment Contract provided that its terms were to be "construed in accordance with the laws of the State of Texas," but did not contain any forum selection clause, and did not otherwise expressly assert that the employment relationship it created would be governed by Texas law.[2] *See* Employment Contract, ¶ 15 (Declaration of Jeff Cutshall ("J. Cutshall Decl."), Exh. A, ¶ 15.

According to Moore's allegations, at all material times the Cutshalls served as Moore's joint employers with GSI. Beginning at some time prior to the formation of GPI on February 14, 2012, according to Moore's allegations, and possibly as early as the inception of Moore's employment by GSI, GPI also served as Moore's joint employer with GSI. Indeed, on or around January 4, 2011, prior to the date Moore executed the employment agreement with GSI, an internal email message announced that Moore would serve as a "sales representative of Gulf Packaging."

Moore was supplied business cards in connection with his employment by GSI and/or GPI. The employer name listed on Moore's business cards was "Gulf Packaging."

Although neither GSI nor GPI had physical offices in Oregon at the time Moore's employment began, by June or July 2012 GSI and/or GPI maintained an office in Portland, Oregon, which they held out as a "Gulf Packaging" office.

Possibly in connection with Moore's employment, GSI registered a motor vehicle in Oregon.

---

[2] Notwithstanding the Employment Contract's choice-of-law provision, as a matter of Oregon statutory law, and with exceptions that are plainly inapplicable here, Oregon courts apply Oregon law in connection with disputes arising out of employment contracts for services to be rendered primarily in Oregon by Oregon residents. *See* Or. Rev. Stat. § 15.320(3).

On or around April 10, 2015, GSI terminated Moore's employment. At the time of his termination, GSI and/or GPI and/or the Cutshalls owed Moore $86,824.17 in unpaid commissions. Moore has not to date received those unpaid commissions.

At or around the time of his termination, Moore called the telephone number that he had previously used to reach the offices of "Gulf Packaging" in Texas, and the call was answered by a representative of GAPCO.

As noted above, GPI filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois under Chapter 11 of the Bankruptcy Code on April 29, 2015. GPI's bankruptcy plan listed GAPCO (as well as GSI and other business entities) as one of its affiliates. Prior to that date, GAPCO hired some GPI employees and purchased some of GPI's assets. Moore was not listed as a creditor of GPI in connection with its bankruptcy petition.

On May 26, 2015, Moore emailed the Cutshalls and other GSI, GPI, and/or GAPCO employees using "Gulf Packaging" email addresses to advise them that he was owed unpaid commissions. At the time Moore sent that email message, the Cutshalls were employed by GAPCO. It does not appear that Moore received any response to his message from any of its recipients.

On July 17, 2015, GPI moved the bankruptcy court for leave to sell a large proportion of its remaining assets to GAPCO free and clear of any liens, claims, encumbrances, and interests. On July 27, 2015, an "Official Committee of Unsecured Creditors" of GPI (apparently not including Moore) filed a motion with the bankruptcy court indicating, *inter alia*, that the Committee believed GAPCO held information regarding GPI's assets.

Three days later, on July 30, 2015, the bankruptcy court granted GPI's motion for leave to

sell assets to GAPCO free and clear of any claims by third-party creditors. The court expressly found that "[t]he sale process was fair and reasonable and conducted in a non-collusive, good faith manner." Order (I) Authorizing and Approving Asset Purchase Agreement by and among Gulf Atlantic Packaging Corporation, as Buyer, and Gulf Packaging, Inc., as Seller, and (II) Authorizing Sale of Sale Assets Free and Clear of all Liens, Claims, Encumbrances and Interests ("Authorization Order"), United States Bankruptcy Court for the Northern District of Illinois Case No. 15-15246, Docket No. 186, at Preamble ¶ D. The court further found as follows:

G.    Buyer [GAPCO] is purchasing the Sale Assets [of GPI] in good faith and is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code. Buyer is entitled to the full protections of Section 363(m) of the Bankruptcy Code, and has proceeded in good faith in all respects in connection with the Motion and the Sale in that, among, other things: (i) Buyer recognized and agreed that the Debtor [GPI] was free to deal with any other party interested in acquiring the Sale Assets, (ii) all payments to be made by Buyer and other agreements or arrangements entered into by Buyer in connection with the Sale have been disclosed; (iii) Buyer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction; (iv) the negotiation and execution of the Purchase Agreement was without collusion, at arms-length and in good faith in all respects; and (v) the existence of the relationship of and between Buyer's principals to and with the Debtor was disclosed in the Motion.

* * *

L.    The Sale will not effectuate a *de facto* reorganization of the Debtor.

M.    Buyer is not a mere continuation of the Debtor or its estate, and Buyer is not holding itself out to the public as a continuation of the Debtor.

N.    The transfer of the Sale Assets to Buyer will be, as of the Closing Date, a legal, valid and effective transfer of such assets, and vests or will vest Buyer with all right, title and interest of the Debtor to the Sale Assets free and clear of all Liens arising or relating thereto any time prior to the Closing Date, except for any liabilities expressly assumed by Buyer under the Purchase Agreement [of which none exist].

Authorization Order, Preamble ¶¶ G, L-N.

    Regarding the transfer of assets from GPI to GAPCO, the court expressly ordered that:

    Pursuant to Sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Sale Assets on the Closing Date. Such Sale Assets shall be transferred to Buyer "as is, where is" to the extent provided in the Purchase Agreement upon and as of the Closing Date. **The purchase and sale of the Sale Assets and the related transfer** constitutes a legal, valid, binding and effective transfer of the Sale Assets and **shall be free and clear of all Liens** [defined as including "all liens, claims, encumbrances and interests"]. Upon the closing of the Sale, Buyer shall take title to and possession of the Sale Assets. **The transfer of title to the Sale Assets shall be free and clear of (a) any and all Liens, and (b) any and all claims including, without limitation, any and all claims pursuant to any successor or successor-in-interest liability theory. All Liens shall attach solely to the proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Sale Assets,** subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

Authorization Order, ¶ 7 (emphasis supplied). The order further provides that:

    Except as specifically provided by the Purchase Agreement or this Order, all entities holding Liens or interests in or on any portion of the Sale Assets arising under or out of, in connection with or in any way relating to the Debtor, the Sale Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Sale Assets to Buyer, are forever barred, estopped and permanently enjoined from asserting against Buyer or its successors or assigns, their property or the Sale Assets, any such Liens on the Sale Assets.

Authorization Order, ¶ 8. In similar vein, the order provides that:

    14.    Except as otherwise expressly set forth in this Order or the Purchase Agreement [which is silent as to this question], Buyer shall not have any liability or other obligation of the Debtor arising under or related to any of the Sale Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Purchase Agreement, Buyer shall not be liable for any claims against the Debtor or any of its predecessors or affiliates.

    15.    Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtor and/or its estate including, but not limited to, any liability or responsibility for any

Page 10 - FINDINGS AND RECOMMENDATION

> claim against the Debtor or against an insider of the Debtor, or similar
> liability except as otherwise expressly provided in the Purchase Agreement
> [which is silent as to this question].  Buyer has given substantial
> consideration under the Purchase Agreement for the benefit of the holders
> of any Liens.  The consideration given by Buyer shall constitute valid and
> valuable consideration for the releases of any potential claims of successor
> liability of Buyer, which releases shall be deemed to have been given in
> favor of Buyer by all holders of Liens.

Authorization Order, ¶¶ 14-15.

The bankruptcy court's order further provides that it "shall be binding in all respects upon the Debtor, its estate, all creditors, all holders of equity interests in the Debtor, *all known holders of any claim(s) against the Debtor*, any holders of Liens against or on all or any portion of the Sale Assets, Buyer and all successors and assigns of Buyer." Authorization Order, ¶ 6 (emphasis supplied).  The order additionally provides that it "is and shall be binding upon and govern the acts of all entities who received notice of the Motion." Authorization Order, ¶ 12.  There is no evidence that Moore's claim against GPI was known to the bankruptcy court or that Moore had received any notice of GPI's motion at the time the court's order issued.

GSI ceased business operations shortly after the sale of GPI's assets to GAPCO.  At or around that same time, GSI sold all of its assets to GAPCO.  *See* Declaration (#7) of Carol Cutshall ("C. Cutshall Decl."), ¶ 7.  The proceeds of that sale were used in part to pay GSI's creditors, and the remainder has not yet been distributed, but rather is being kept in a bank account apparently under Carol's control.  *See id.*

On March 2, 2016, Moore's counsel sent a written demand to all defendants via certified mail for Moore's unpaid commissions.  Defendants do not appear to have responded to that letter.

Effective May 13, 2016, GSI was formally dissolved.

Page 11 - FINDINGS AND RECOMMENDATION

## ANALYSIS

It is Moore's position that this court may properly exercise specific personal jurisdiction over each defendant herein based on each defendant's alleged role in jointly employing Moore to perform sales services on defendants' behalf in Oregon (or, in GAPCO's case, as successor in interest to one of his alleged joint employers). As suggested above, GAPCO takes the position that this court lacks personal jurisdiction over it because it did not hire and never employed Moore, and moreover that it obtained the assets of Moore's alleged former joint employer GPI free and clear of GPI's liabilities including Moore's claim against GPI. Moore takes the responsive position that, notwithstanding the language of the bankruptcy court's Authorization Order, GAPCO is GPI's successor in interest for purposes of Moore's claim.

GSI and the Cutshalls acknowledge that GSI purposefully directed activities into Oregon when it entered into an employment relationship with Moore, an Oregon resident, and subsequently defaulted on its obligations to compensate him for his employment services, and further concede that Moore's claim against GSI arises out of that Oregon-directed activity. However, as to GSI, those defendants argue that it would nevertheless not comport with fair play and substantial justice for GSI to be haled into court in Oregon; as to the Cutshalls, those defendants argue that it was GSI rather than the Cutshalls that hired and employed Moore, and that it is factually incorrect to suggest that the Cutshalls could have been Moore's joint employers or that the Cutshalls purposefully directed activity into Oregon. Moore takes the responsive positions that it is reasonable to hale GSI into court in Oregon and that the Cutshalls were his joint employers and/or *alter egos* of GSI and/or GPI, and moreover that they personally directed activity into Oregon when they allegedly directed GSI to terminate his employment without

paying him the commissions he was at that time due and owing, such that it is likewise

reasonable to hale them into court in this district.

In addition to the foregoing, each set of moving defendants challenges venue in Oregon in

the alternative to the challenges to personal jurisdiction.  Specifically, GAPCO argues for

dismissal on grounds of improper venue while GSI and the Cutshalls argue for transfer to a

district court of Texas.

I address and analyze the parties' arguments below.

I.    **Defendants' Motions to Dismiss for Lack of Personal Jurisdiction**

"When no federal statute governs personal jurisdiction, the district court applies the law

of the forum state." *Boschetto*, 539 F.3d at 1015, *citing Panavision Int'l L.P. v. Toeppen*, 141

F.3d 1316, 1320 (9th Cir. 1998).  Oregon's long-arm statute creates a standard co-extensive with

federal jurisdictional standards, *see* Or. R. Civ. P. 4L, so a federal court sitting in the District of

Oregon may exercise personal jurisdiction wherever it is possible to do so within the limits of

federal constitutional due process, *see, e.g., Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758,

760 (9th Cir. 1990).

Federal due process jurisprudence requires that, to be subject to the personal jurisdiction

of a federal court, a nonresident defendant must have at least "'minimum contacts'" with the

court's forum state such that "the exercise of jurisdiction 'does not offend traditional notions of

fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801

(9th Cir. 2004), *quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Two

forms of personal jurisdiction are available for application to a nonresident defendant:  general

personal jurisdiction and specific personal jurisdiction.  Here, Moore argues only that this court

may properly exercise specific personal jurisdiction over each defendant.

The courts of the Ninth Circuit apply a three-pronged test for determining whether, in connection with a given claim, the exercise of specific personal jurisdiction over a nonresident defendant is appropriate:

(1)    The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum . . . ; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2)    the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3)    the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802, *quoting Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987). The plaintiff bears the burden of satisfying the first two prongs of the test, whereupon the burden shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).

In the context of cases that sound primarily in contract, the Ninth Circuit applies a "purposeful availment" analysis to determine whether a defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" and thereby satisfying the first prong of the three-pronged test. *Schwarzenegger*, 374 F.3d at 802, *quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In the context of cases that sound primarily in tort, to determine whether the first prong of the three-pronged minimum-contacts test is satisfied the courts of the Ninth Circuit employ a three-part "effects" test derived from *Calder v. Jones*, 465 U.S. 783, 789 (1984), which requires that the

Page 14 - FINDINGS AND RECOMMENDATION

defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). "The requirement is but a test for determining the more fundamental issue of whether a 'defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.'" *Id.*, *quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In applying the *Calder* effects test, the courts are required to "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). That is, the out-of-state defendant's relationship with the forum state "must arise out of contacts that the 'defendant *himself*' creates with the forum State," *id.* (emphasis original), *quoting Burger King*, 471 U.S. at 475, and the defendant's link with the forum state cannot be based solely on the defendant's conduct directed toward the plaintiff, notwithstanding that the plaintiff is a forum-state resident, or otherwise solely on the plaintiff's own contacts with the forum state, *see id.* at 1122-1123. "Thus, a 'mere injury to a forum resident is not a sufficient connection to the forum.' . . . Rather, 'an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State.'" *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015), *quoting Walden*, 134 S. Ct. at 1125.

The second prong of the three-pronged minimum-contacts test for specific personal jurisdiction requires that the plaintiff's claim arise out of the nonresident defendant's forum-related activities. *See Boschetto*, 539 F.3d at 1016. Moreover, it has long been settled law in the Ninth Circuit that "[w]here. . . a plaintiff raises two [or more] separate causes of action, the

court must have in personam jurisdiction over the defendant with respect to each claim." *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1289, n. 8 (9th Cir. 1977), *citing* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1588, at p. 816 (1971).

At the third prong of the specific personal jurisdiction test, the burden shifts to the defendant to present a "compelling case" to rebut the presumption that the exercise of specific personal jurisdiction would be reasonable. *See id.*

> In determining reasonableness, th[e] [courts of the Ninth] [C]ircuit examine[]
> seven factors: the extent of purposeful interjection; the burden on the defendant
> to defend the suit in the chosen forum; the extent of conflict with the sovereignty
> of the defendant's state; the forum state's interest in the dispute; the most efficient
> forum for judicial resolution of the dispute; the importance of the chosen forum to
> the plaintiff's interest in convenient and effective relief; and the existence of an
> alternative forum.

*Shute v. Carnival Cruise Lines*, 897 F.2d 377, 386 (9th Cir. 1990) (modifications supplied), *citing Federal Deposit Ins. Corp. v. British-American Ins. Co., Ltd.*, 828 F.2d 1439, 1442 (9th Cir. 1987). "The court[s] must balance the seven factors to determine whether the exercise of jurisdiction would be reasonable." *Id.*, *citing British-American*, 828 F.2d at 1442.

## A.    Specific Personal Jurisdiction over Defendant GSI

It is undisputed that GSI entered into a contract with Moore, an Oregon resident, pursuant to which Moore agreed to perform employment services for GSI (and/or for its affiliates) in Oregon, and that Moore's wage and hour claim arises out of that relationship. GSI concedes that these facts are sufficient to satisfy Moore's burden under the first two prongs of the specific personal jurisdiction test. I agree with the parties that Moore's claim arises out of GSI's express aiming of conduct into Oregon (including not merely entering into an employment contract to be performed primarily in Oregon by an Oregon resident and subsequently failing to compensate

Page 16 - FINDINGS AND RECOMMENDATION

that Oregon resident for her services, but also registering to do business in Oregon, registering a

vehicle in Oregon for Moore's use in the course of his employment duties, maintaining a facility

in Oregon, and conducting business in Oregon), and that these facts are sufficient to shift the

burden to the defendants to present a compelling case that it would nevertheless be unreasonable

for GSI to be haled into court in Oregon.

As to the seven-factor reasonableness inquiry at the third prong of the specific jurisdiction

test, GSI likewise concedes that the first factor – purposeful interjection – weighs in favor of

personal jurisdiction over GSI in Oregon.  I agree with the parties that the first factor mitigates in

favor of the exercise of specific personal jurisdiction over GSI.

The second factor – the burden on the defendant if required to litigate in the plaintiff's

chosen forum – by contrast necessarily weighs against the exercise of specific personal

jurisdiction over GSI.  GSI is a dissolved entity with limited assets that can act only through its

sole shareholder (*see* Or. Rev. Stat. § 60.645), Carol, a Texas resident with significant health

issues.  Under the circumstances, to require GSI to litigate in Oregon would constitute a

nontrivial burden.

The parties appear to agree that the third factor – conflict between Oregon and Texas

sovereignty – is a wash.  I disagree with the parties on this point.  As noted above, Moore's

Employment Contract with GSI contains a provision specifying that its terms are to be construed

in accordance with the laws of the State of Texas, while the Oregon courts do not countenance

the application of a different state's law to contract for employment services to be performed by

an Oregon resident primarily in Oregon.  As such, the courts of Oregon, including this court,

would apply Oregon law to the parties' dispute, *see* Or. Rev. Stat. § 15.320(3), whereas a Texas

court would more likely than not treat the Texas choice-of-law provision as enforceable, *see, e.g.,* *Ennis, Inc. v. Dunbrooke Apparel Corp.*, 427 S.W.3d 527 (Tex. App. 2014). Thus, notwithstanding the parties' contrary position, this case presents a potential conflict between the sovereignty of the states of Oregon and Texas, and the third factor mitigates in favor of the exercise of specific personal jurisdiction over GSI.

As to the fourth factor – Oregon's interest in adjudicating Moore's dispute with GSI – it appears clear in light of Section 15.320(3) that Oregon has a manifest interest in adjudicating disputes between Oregon employees and out-of-state employers. The fourth factor consequently mitigates in favor of the exercise of specific personal jurisdiction over GSI in Oregon.

The parties dispute the proper application of the fifth factor (the most efficient forum for disposition of the dispute). GSI asserts that all witnesses other than Moore are either in Texas or in Georgia, and that in light of the Employment Contract's choice-of-law provision Texas law governs the parties' dispute, such that Texas is the most efficient forum for this litigation. Moore asserts to the contrary that there are witnesses other than himself located in Oregon, that some documentary evidence is in Oregon, and that in light of Section 15.320(3) Oregon law governs the parties' dispute, such that Oregon is the most efficient forum for this litigation. Because it appears that there are witnesses in Oregon, witnesses in Texas, and witnesses outside either of the two candidate fora, and because it further appears that if this action were litigated in Oregon the court would apply Oregon law whereas if this action were litigated in Texas the court would apply Texas law, I find that the fifth factor is effectively a wash.

The sixth factor – the importance of the chosen forum to the plaintiff's interest in convenient and effective relief – necessarily weighs in favor of exercising specific personal

Page 18 - FINDINGS AND RECOMMENDATION

jurisdiction over GSI in Oregon. Moore has no meaningful contact with Texas, and he seeks relief that is available under Oregon law but may not be available under Texas law.

Finally, the seventh factor – the existence of an alternative forum – necessarily weighs against the exercise of specific personal jurisdiction over GSI in Oregon. It is undisputed that Moore could bring a wage and hour claim against GSI in the Southern District of Texas. Moore argues that in light of Section 15.320(3), a Texas forum is practically unavailable to him (in that a Texas court would not construe his claims as governed by Oregon law), but this argument ignores the fact that a Texas court applying Texas law would be bound to enforce GSI's contractual obligation to compensate Moore for the employment services he performed.

In summary, the second and seventh factors weigh against the exercise of specific personal jurisdiction over GSI in Oregon, the fifth factor is a wash, and the first, third, fourth, and sixth factors all mitigate in favor of exercising specific personal jurisdiction over GSI here. On balance, and in consideration of all applicable circumstances, it would therefore be reasonable for this court to exercise specific personal jurisdiction over GSI. It follows that GSI and the Cutshalls' motion (#6) to dismiss for lack of personal jurisdiction should be denied as to defendant GSI. GSI should be directed to advise the court whether it waives its entitlement to a plenary evidentiary hearing as to the facts underlying the foregoing analysis and recommendation, or whether to the contrary it wishes to go forward with a plenary evidentiary hearing on the ground that such a hearing could lead to the establishment of facts that materially differ from the undisputed facts relied upon above.

### B.    Specific Personal Jurisdiction over Defendants the Cutshalls

Moore offers several alternative theories in support of his position that this court may

properly exercise specific personal jurisdiction over each of the Cutshalls, specifically (i) that

each of the Cutshalls was the *alter ego* of GSI, such that it would be appropriate to exercise

personal jurisdiction over each of them on the basis of GSI's contacts with Oregon, (ii) that each

of the Cutshalls was Moore's joint employer with GSI (and/or GPI), such that it would be

appropriate to exercise personal jurisdiction over each of them on the basis of their express

aiming of conduct into Oregon (specifically, hiring an Oregon resident to perform employment

services primarily in Oregon, executing an employment contract with him, and subsequently

failing to compensate him for his services), (iii) that each of the Cutshalls had actual (as opposed

to imputed) personal contacts with Oregon sufficient to satisfy the specific personal jurisdiction

standard as to each of them, (iv) that Carol as GSI's sole shareholder may properly be found

liable for GSI's misconduct on a shareholder-liability theory, based on her alleged and/or

suggested conduct in causing GSI's corporate assets to be used to the Cutshalls' personal

advantage, to repay their personal debts, and/or to provide disbursements directly or indirectly to

themselves, and (v) that Jeff as a GSI executive may properly be found liable for GSI's

misconduct on a trust-fund-doctrine theory, based on his alleged and/or suggested conduct in

causing GSI's corporate assets to be used to the Cutshalls' personal advantage, to repay their

personal debts, and/or to provide disbursements directly or indirectly to themselves. It is Moore's

burden to establish a *prima facie* showing of facts supporting the exercise of personal jurisdiction

over each of the Cutshalls in Oregon under at least one of his proffered theories.

I address the parties' arguments in connection with each of Moore's jurisdictional theories

below. For the reasons discussed below, GSI and the Cutshalls' motion (#6) to dismiss for lack

of personal jurisdiction should be granted as to defendants the Cutshalls, and Moore's claims

Page 20 - FINDINGS AND RECOMMENDATION

against those two defendants, or either of them, should be dismissed without prejudice for lack of personal jurisdiction. Such disposition should not be construed as barring Moore from seeking leave to amend his pleading to restate his claims against one or both of the Cutshalls in the event he believes he can accurately allege facts which, if proven, would give rise to personal jurisdiction over either or both of them.

1.     **Moore's Theories of Specific Personal Jurisdiction over the Cutshalls Premised on Imputed Jurisdictional Contacts**

Historically, the Ninth Circuit recognized two exceptions to the rule that one entity's contacts with a forum jurisdiction may not permissibly be imputed to another entity lacking such contacts for personal jurisdictional purposes, applying specifically where (i) the two entities are *alter egos* of one another or (ii) where the second entity acts as the first entity's agent in establishing the contacts at issue.[3] *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003). Moore has not met his burden to establish that this court may properly exercise specific personal jurisdiction over either of the Cutshalls under any theory of imputed jurisdictional contacts.

a.     **Moore's *Alter Ego* Theory of Imputed Specific Personal Jurisdiction over the Cutshalls**

Moore argues, correctly, that where a corporation within the personal jurisdiction of a federal court is the *alter ego* of one or more individual defendants, the same facts giving rise to

---

[3] As will be discussed in greater detail below, some courts (not including the Ninth Circuit) have, in addition, recognized a third exception to the general rule against imputation of jurisdictional contacts, specifically applicable to successors in interest of an entity within the personal jurisdiction of a federal court. Moore does not offer argument or evidence that the Cutshalls, or either of them, should be deemed subject to personal jurisdiction in this court on a successor-in-interest theory, other than to the extent that as a dissolved corporation GSI may only appear through its sole shareholder, Carol.

personal jurisdiction over the corporation will give rise to personal jurisdiction over the individuals. *See Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984) (citations omitted). "To apply the *alter ego* doctrine [in order to meet the constitutional minimum requirements for the exercise of personal jurisdiction], the court must determine (1) that there is such unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist and (2) that failure to disregard the corporation would result in fraud or injustice." *Id.* (citations omitted).

The *Flynt Distributing* court found that a district court did not err in finding that individual defendants were the *alter egos* of corporate defendants within the court's personal jurisdiction on the basis of hearsay affidavits (inadmissible at trial but admissible for jurisdictional purposes) that had been offered in support of the proposition that the individuals caused the transfer of valuable assets from the corporate defendants to other, non-defendant corporate entities, leaving the corporate defendants undercapitalized. *See id.* at 1393-1394. By contrast, the *Unocal* court, *supra*, found that a district court did not err in finding that it lacked personal jurisdiction over corporate subsidiary defendants alleged to be the *alter egos* of a corporate parent defendant within its personal jurisdiction where, despite evidence that the parent exercised significant control over the subsidiaries, the subsidiaries were adequately capitalized and the appropriate corporate formalities were observed. *See Unocal*, 248 F.3d at 927-928.

Here, Moore's complaint does not contain allegations providing direct support for the conclusion that either of the Cutshalls could have been GSI's *alter ego. See* Complaint, *passim*. By and through his declaration offered in support of his opposition to the defendants' motions now before the court, Moore provides testimony that the Cutshalls, Sarkisian, and other

employees of GSI and/or GPI treated GSI and GPI interchangeably or as a single entity, and

generally supporting the proposition that GSI and GPI operated as his joint employers, but does

not offer testimony tending to support the conclusion that the Cutshalls, or either of them, caused

GSI to be undercapitalized, failed to document transactions between themselves and GSI, or took

improper disbursements from GSI. *See* Declaration (#14) of Alan Moore ("Moore Decl."), ¶¶ 6-

7, 9-11, 15-21, 34, *et passim*. By contrast, in written and oral argument (and without supporting

evidence or supporting allegations) Moore takes the position that the Cutshalls may have used

GSI's assets to pay their own personal debts and may have caused GSI to be undercapitalized at

the time his final unpaid commissions were due and owing.[4] Because it is Moore's burden to

make a *prima facie* showing of personal jurisdiction over each of the Cutshalls through either the

allegations of his complaint or proffered evidence, *see Boschetto*, 539 F.3d at 1015, Moore's

unsupported argument is insufficient to satisfy that burden. Moore's *alter ego* theory thus

provides no grounds for denying the Cutshalls' motion to dismiss for lack of personal

jurisdiction.

  **b.**  **Moore's Agency (Joint-Employer) Theory of Imputed Specific Personal Jurisdiction over the Cutshalls**

As noted above, Moore argues that Carol and Jeff were at all material times each his joint

employers, together with GSI (and GPI). To the extent Moore argues that, in consequence of

their purported status as his joint employers, GSI's purposeful direction of conduct into Oregon

may properly be imputed to the Cutshalls, I address that argument in this subsection of this

---

  [4] As noted above, Carol offers her own declaration testimony that in fact GSI continues to maintain a cash reserve for the purpose of paying GSI's creditors, *see* C. Cutshall Decl., ¶ 7; Moore offers no evidence to rebut Carol's testimony that GSI remains capitalized post-dissolution.

Findings and Recommendation.  To the extent that Moore argues that *qua* joint employers the

Cutshalls, or either of them, had personal (as opposed to imputed) contacts with Oregon

sufficient to justify the exercise of specific personal jurisdiction over them here, I address that

argument below.

It is fairly well established that the *liability* of an employer to its employee for violation

of employment law or of the provisions of an employment contract may be imputed to a joint

employer, *see, e.g.*, *Torres-Lopez v. May*, 111 F.3d 633, 638-641 (9th Cir. 1997), but the Ninth

Circuit has never held that *personal jurisdiction* over an employer may be imputed to a joint

employer not otherwise subject to personal jurisdiction in the district, and the majority of district

courts to have considered the question (but not all of them) have determined that such imputation

of personal jurisdiction would be constitutionally improper, *see, e.g.*, *Rashidi v. Veritiss, LLC*,

Case No. 2:16-CV-4761-CAS, 2016 U.S. Dist. LEXIS 129152, *10-13 (C.D. Cal. Sep. 19, 2016)

(and cases collected therein).

As noted above, the Ninth Circuit historically recognized only the *alter ego* and the

agency exception to the general rule that one entity's contacts with a forum jurisdiction may not

permissibly be imputed to another entity lacking such contacts for personal jurisdictional

purposes. *See Harris Rutsky*, 328 F.3d at 1134.  In light of the fact that the Ninth Circuit

historically recognized the agency theory but never recognized the joint-employer theory of

imputed jurisdictional contacts, and in light of the reality that joint employers effectively serve as

one another's agents with respect to their rights and obligations vis-à-vis their joint employees, it

appears reasonable to conclude that, to the extent the joint-employment theory of imputed

jurisdictional contacts could at any time have been well taken, it was so only because status as

joint employers may properly be understood as a special case of mutual agency. That is, the courts espousing the minority view that status as a joint employer could justify the imputation of jurisdictional contacts from one joint employer to another did not err to the extent that those contacts could properly have been so imputed on an agency theory.

In 2014, the United States Supreme Court rejected the Ninth Circuit's test for determining the propriety of exercising personal jurisdiction on an agency theory. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 759 (2014). Although the *Daimler* court did not expressly reject all possible articulations of the agency theory of personal jurisdiction, in 2015 the Ninth Circuit held that after *Daimler*, the agency theory was no longer viable, and that only the *alter ego* theory remained as a mechanism for the imputation of personal jurisdictional contacts. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1071 (9th Cir. 2015). This court is bound by the Ninth Circuit's decision in *Ranza* to find that in the absence of any viable agency theory of imputed jurisdiction, there can be no valid joint-employment theory of imputed personal jurisdiction. Moore's joint-employer theory of imputed jurisdictional contacts accordingly provides no grounds for denying the Cutshalls' motion to dismiss for lack of personal jurisdiction.

        **c.**      **Moore's Shareholder-Liability Theory of Imputed Specific Personal Jurisdiction over Carol and Trust-Fund-Doctrine Theory of Imputed Specific Personal Jurisdiction over Jeff**

Moore additionally argues that this court may properly exercise specific personal jurisdiction over Carol on a theory of shareholder liability, based on his asserted position (unsupported by allegations or evidence) that she may have received distributions of funds from GSI that should properly have been used to pay Moore's commissions. The doctrine of shareholder liability upon which Moore relies is a creature of Oregon law and is strictly a theory

of imputed liability, *see* Or. Rev. Stat. § 60.645; no Oregon (or federal) court has relied upon the shareholder-liability doctrine to support imputation of jurisdictional contacts from a corporation to one of its shareholders. As a theory of imputed liability, Moore's shareholder-liability theory provides no grounds for denying the Cutshalls' motion to dismiss for lack of personal jurisdiction.

Similarly, Moore argues that this court may properly exercise specific personal jurisdiction over Jeff on the basis of the so-called "trust fund doctrine," based on his asserted position (unsupported by allegations or evidence) that Jeff may have caused GSI to make payments to himself or to Carol rather than pay Moore's unpaid commissions. Again, the doctrine upon which Moore relies is a creature of Oregon law and is strictly a theory of imputed liability, *see Gantenbein v. Bowles*, 103 Or. 277, 292 (1922) (citations omitted), and has never been applied to support imposition of jurisdictional contacts from a corporation to one of its officers or directors. As such, the trust-fund doctrine provides no grounds for denying the Cutshalls' motion to dismiss for lack of personal jurisdiction.

### 2.    Moore's Theories of Specific Personal Jurisdiction over the Cutshalls Premised on Direct Jurisdictional Contacts

Moore takes the position that Carol and Jeff each have sufficient personal contacts to support the exercise of specific personal jurisdiction over each of them even in the absence of any theory of imputation. The Cutshalls respond that their personal contacts with Oregon are insufficient to support the exercise of specific personal jurisdiction over them here, and further argue that even if their personal contacts were sufficient, they took place in the course of their service to GSI and/or GPI and are therefore inapplicable to either of the Cutshalls in their

individual capacities, by operation of the fiduciary shield doctrine.

        **a.**     **Moore's Theory of Direct Specific Personal Jurisdiction over the Cutshalls Premised on Conduct Undertaken in the Cutshalls' Capacities as Owners, Directors, Officers, and/or Employees of GSI and/or GPI**

In fact, the courts of the Ninth Circuit recognize the fiduciary shield doctrine, but do not apply it in the manner advocated by the Cutshalls:

> Under the fiduciary shield doctrine, a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person. *See Weller v. Cromwell Oil Co.*, 504 F.2d 927 (6th Cir. 1974); *United States v. Montreal Trust Co.*, 358 F.2d 239 (2d Cir.), *cert. denied*, 384 U.S. 919, 16 L. Ed. 2d 440, 86 S. Ct. 1366 (1966); *see also* 4 C. Wright & A. Miller, Federal Practice and Procedure § 1069 at 370 (2d ed. 1987). Rather, there must be a reason for the court to disregard the corporate form.

*Davis v. Metro Productions, Inc.*, 885 F.2d 515, 520 (9th Cir. 1989). However, following the United States Supreme Court's opinion in *Calder v. Jones*, 465 U.S. 783 (1984), the *Davis* court expressly found that while an employer corporation's contacts are not to be imputed to that corporation's employees for personal jurisdictional purposes, in the jurisdictional context (unlike the context of determining potential liability), such persons' "status as employees does not somehow insulate them from jurisdiction." *Id.* at 521, *quoting Calder*, 465 U.S. at 790. The court expressly found that, where (as is the case in Oregon, *see* Or. R. Civ. P. 4(L), *Gray & Co, v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990)) the limits of long-arm personal jurisdiction are co-extensive with the limits of federal constitutional due process, a federal court may exercise personal jurisdiction over the officers or other representatives of a corporation if those officers or representatives have sufficient personal contacts with the forum, notwithstanding the fiduciary shield doctrine and notwithstanding that such contacts may have

taken place in such persons' official capacities or in the course of their duties to the corporation. *See Davis*, 885 F.2d at 521. Naturally, the finding that it could be appropriate to exercise personal jurisdiction over a corporate officer (or other representative) on the basis of contacts taking place in such person's official capacity would not imply that it could be appropriate to impose liability on that person for the same acts, absent grounds for piercing the corporate veil.

It is thus appropriate, as Moore urges, for the court to consider whether Carol's or Jeff's personal contacts with Oregon are sufficient to justify the exercise of specific personal jurisdiction over them, including where such contacts took place in their official capacities. As to Carol, Moore's complaint contains no allegations that Carol purposefully directed conduct into Oregon, *see* Complaint, *passim*, and the only evidence Moore offers as to Carol's material conduct is his declaration that, in her capacity as GSI's director of human resources, Carol sent him materials related to his benefits and to his employment via email, *see* Moore Decl., ¶ 18. Because there can be no serious argument that Moore's claims arise out of that Oregon-directed conduct, this court may not properly exercise specific personal jurisdiction over Carol on the basis of her own Oregon-directed conduct.

As to Jeff, Moore's complaint similarly contains no allegations that Jeff purposefully directed conduct into Oregon. *See* Complaint, *passim*. However, Moore offers his declaration testimony that Jeff signed the Employment Contract between Moore and GSI on GSI's behalf, that during the course of Moore's employment by GSI (in particular during the final six months of Moore's employment), Jeff was in regular email and phone contact with Moore in the course of which he assured Moore that Moore's employment was not jeopardized by GSI's financial difficulties, and that but for Jeff's assurances, Moore would not thereafter have remained in GSI's

employ and would not have performed the employment services for which he now seeks compensation. *See* Moore Decl., ¶¶ 12, 19, 32, 33. This testimony presents a closer jurisdictional question than does Moore's testimony regarding Carol's direct involvement, in that it suggests that Moore's claims would not have arisen but for Jeff's Oregon-directed conduct, but even so Moore's testimony falls short of satisfying the jurisdictional requirement that his claims arise *out of* the conduct in question. Because Moore neither alleges nor offers evidence that Jeff directed that GSI (and/or GPI) refuse to pay him the commissions he was owed, he has failed to meet his burden to establish that the exercise of personal jurisdiction over Jeff would be proper on the basis of Jeff's own direct contacts with Oregon.

> **b.      Moore's Theory of Direct Specific Personal Jurisdiction over the Cutshalls Premised on Conduct Undertaken in the Cutshalls' Purported Capacities as Joint Employers**

Moore's final theory of specific personal jurisdiction over the Cutshalls is that, as his joint employers, each of the Cutshalls had an independent duty to compensate Moore for his services to them, such that their election not to pay Moore his unpaid commissions constitutes purposeful direction of tortious conduct into Oregon even in the absence of any imputed jurisdictional contacts. For the purpose of showing that the Cutshalls were his joint employers, Moore relies on his allegations that each of the Cutshalls is "liable [to him] as [his] joint employer[]" and that each of the Cutshalls "acted on behalf of [GSI] in respect to setting [his] compensation," Complaint, ¶ 19, his allegations that Jeff was at all material times GSI's president and that Carol was at all material times GSI's primary shareholder, *see* Complaint, ¶¶ 4-5, his declaration testimony that Jeff signed the Employment Contract on behalf of GSI, *see* Moore Decl., ¶ 12, and his unsupported argumentative assertions that both of the Cutshalls acted on behalf of GSI (and

Page 29 - FINDINGS AND RECOMMENDATION

GPI) in determining his rate of pay, compensating him for some of his services, and ultimately refusing to pay his final commissions, *see* Opposition Memorandum (#13) at 11. In evaluating whether Moore has met his burden in response to the Cutshalls' motion, the court should disregard Moore's conclusory allegations regarding the ultimate issue of liability and regarding the legal question of joint employer status, and should likewise disregard Moore's unsupported argumentative assertions. *See Boschetto*, 539 F.3d at 1015.

Under Oregon law, an employer is defined as "any person who employs another person." Or. Rev. Stat. § 653.010(3). To determine whether a person employs another, the Oregon courts apply an "economic realities" test. *See Cejas Commer. Interiors, Inc. v. Torres-Lizama*, 260 Or. App. 87, 103 (2013). That test includes five regulatory factors, specifically (i) the nature and degree of control exercised by the putative employer over the employee, (ii) the degree of the putative employer's supervision of the employee's work, (iii) the putative employer's power to determine the amount and method of the employee's pay, (iv) the putative employer's right to hire, fire, or change the terms and conditions of employment of the employee, and (v) the putative employer's responsibility to prepare payroll and to pay the employee's wages, as well as eight non-regulatory factors of limited applicability here, aimed at determining whether a putative employee performs services for a putative joint employer that more closely resemble the services of an employee or the services of an independent contractor. *See Cejas*, 260 Or. App. at 106, *citing Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *see also Dinicola v. State*, 246 Or. App. 526, 534 (2011), *citing Torres-Lopez v. May*, 111 F3d 633, 639-640 (9th Cir. 1997), *Boucher v. Shaw*, 572 F3d 1087, 1091 (9th Cir. 2009). In addition, the economic-realities test – at least as developed in the federal courts – requires, when applied to individual officers or

directors of a nominal corporate employer, that the putative individual joint employer hold a

"significant ownership interest with operational control of significant aspects of the [nominal

corporate employer]'s day-to-day functions." *Boucher*, 572 F.3d at 1091. It is well established

that no single factor controls the analysis, and that the courts must consider the totality of the

circumstances in weighing the various factors. *See Dinicola*, 246 Or. App. at 534.

　　As to the economic reality of Carol's relationship to Moore, Carol has the requisite

ownership interest in GSI, Moore's nominal employer, and is alleged to have set the rate of

Moore's compensation on GSI's behalf. However, there is no allegation or evidence that Carol,

in her capacity either as GSI's sole shareholder or as its director of human resources, exercised

any significant degree of control over Moore, supervised Moore's work, had authority to hire or

fire him or modify the terms and conditions of his employment for GSI, or had any responsibility

for paying Moore's wages. In consequence, the first, second, fourth and fifth factors weigh

against finding that Moore has made Carol could be his joint employer. Under the totality of the

circumstances, therefore, I find that Moore has failed to meet his burden to make a *prima facie*

showing that Carol had an obligation independent of GSI's to pay Moore for his services as his

joint employer. In consequence, Moore has not met his burden to show that Carol purposefully

directed tortious conduct into Oregon in connection with his joint-employment theory of direct

specific personal jurisdiction.

　　As to the economic reality of Jeff's relationship to Moore, as GSI's president Jeff had

authority to control Moore, to supervise his work, and to hire and fire him or to change the terms

and conditions of his employment, and he is expressly alleged to have set the rate of Moore's

compensation. However, Jeff lacked the requisite ownership interest in GSI, and there is no

allegation or evidence that he had any responsibility for paying Moore's wages. The fifth factor

and the absence of any significant ownership interest in Moore's nominal employer thus mitigate

against finding that Jeff could be Moore's joint employer together with GSI. Under the totality of

the circumstances, I therefore find that Moore has failed to meet his burden to make a *prima*

*facie* showing that Jeff had an obligation independent of GSI's to pay Moore for his services as

his joint employer. In consequence, Moore has not met his burden to show that Jeff purposefully

directed tortious conduct into Oregon in connection with his joint-employment theory of direct

specific personal jurisdiction.

### C.    Specific Personal Jurisdiction over Defendant GAPCO

Moore's position is that third-party GPI was his joint employer, and as such would be

within this court's specific personal jurisdiction for the same reasons (*mutatis mutandis*) that GSI

is, and in the alternative that GSI and GPI are *alter egos*, such that GSI's jurisdictional contacts

may appropriately be imputed to GPI; it is additionally Moore's position that GAPCO is GPI's

successor in interest, notwithstanding the contrary language of the bankruptcy court's

Authorization Order, such that GPI's jurisdictional contacts with Oregon may appropriately be

imputed to GAPCO, and that GAPCO is also GSI's successor in interest, such that its contacts,

also, may properly be imputed to GAPCO. The first inquiry for this court in connection with

Moore's theory of specific personal jurisdiction over GAPCO is therefore whether Moore has

made a *prima facie* showing either that GPI was Moore's joint employer together with GSI or that

GPI and GSI were *alter egos* to one another.

Moore expressly alleges as follows:

[Moore] worked under the companies [GSI], as well as [GPI]. Both [GSI] and

> [GPI] were plaintiff's joint employer. Both [GPI] and [GSI] had the right to direct
> plaintiff's work, the right to control when plaintiff worked, provided plaintiff with
> space, tools, and materials, assigned tasks and work areas to plaintiff, paid
> plaintiff through a payroll check, provided plaintiff with insurance, and had the
> right to terminate plaintiff.

Complaint, ¶ 11. GAPCO offers no evidence tending to dispute the foregoing allegations.

Because these allegations are sufficient under the economic-realities test for determining status as

an employer, *see Cejas*, 260 Or. App. at 106, I find that Moore has made a *prima facie* showing

that GPI was his joint employer together with GSI. In consequence, it is unnecessary to

determine whether Moore has made a *prima facie* showing that GPI and GSI were *alter egos*, and

I turn instead to the determination whether Moore has made a *prima facie* showing that GAPCO

could be either GSI's or GPI's successor in interest for personal jurisdictional purposes.

The Ninth Circuit (as noted above) has not addressed the question whether an entity's

contacts with a jurisdiction may properly be imputed to a successor in interest for personal

jurisdictional purposes, but the circuit courts to have considered the question have found that a

predecessor corporation's contacts may be imputed to a successor entity for jurisdictional

purposes where the law of the forum state in question would recognize the successor's liability

for the actions of its predecessor. *See, e.g., Patin v. Thoroughbred Power Boats*, 294 F.3d 640,

653 (5th Cir. 2002); *Williams v. Bowman Livestock Equipment Co.*, 927 F.2d 1128, 1132 (10th

Cir. 1991); *City of Richmond v. Madison Management Group*, 918 F.2d 438, 454 (4th Cir. 1990).

"Successor liability doctrines vary from state to state, but generally successor liability will not

attach unless (1) the purchaser expressly or impliedly assumed the liability, (2) the transaction

amounted to a merger or consolidation of the business, (3) the purchaser was merely a

continuation of the seller or (4) the transaction was entered into fraudulently in order to avoid

liability for the obligations." 8 Collier on Bankruptcy ¶ 1141.04[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Oregon law is to precisely this effect. *See Erickson v. Grande Ronde Lbr. Co.*, 162 Or. 556, 568 (1939); *Gonzalez v. Std. Tools & Equip. Co.*, 270 Or. App. 394, 397 (2015). In the absence of clear Ninth Circuit jurisprudence on the question, I recommend that the court follow the decisions of the circuit courts to have considered the question, and find that this court may properly exercise specific personal jurisdiction over GAPCO to the extent that GAPCO would be recognized by the Oregon courts as the successor in interest of either GSI or GPI for purposes of liability in connection with Moore's claims herein.

As to whether Moore has made a *prima facie* showing that GAPCO could be GSI's successor for purposes of liability in connection with Moore's claims as a matter of Oregon law, I note that Oregon statutory law defines the term "employer" to include "any successor to the business of any employer, or any. . . purchaser of any employer's business property for the continuance of the same business, so far as such employer has not paid employees in full." Or. Rev. Stat. 652.310(1). In *Blachana, LLC v. Bureau of Labor & Indus.*, 354 Or. 676 (2014), the Oregon Supreme Court reversed the contrary decision of the Oregon Court of Appeals and held that following the purchase of a sports bar's assets by an entirely separate corporate entity with no affiliation with the original sports bar, the purchaser was liable for the unpaid wages of the sports bar's employees, notwithstanding that those employees had never been employed by the purchaser. *See Blachana*, 354 Or. at 696. Noting that, absent Section 652.310(1), at common law such wage claimants would have had no recourse against the asset purchaser, the *Blachana* court reasoned that Section 652.310(1) was enacted precisely to expand the resources available to employees with unpaid wage claims whose employers render themselves judgment-proof. *See*

Page 34 - FINDINGS AND RECOMMENDATION

*id.* at 693-694. The *Blachana* court approved consideration of the following non-exhaustively

enumerated factors "in determining whether a corporation conducts essentially the same business

as a predecessor":

> The name and identity of the business, its location, the lapse of time between the
> previous operation and the new operation, whether the businesses employed
> substantially the same workforce, whether the same product was manufactured or
> the same services offered, and whether the same machinery, equipment, or
> methods of production were used.

*Id.* at 695. The court expressly noted that although the factors implicating the name and identity

of the business and the absence of substantial overlap of the workforce mitigated against finding

successor liability on the facts before it, the other factors mitigated in favor of successor liability

such that the conclusion that the purchaser was the seller's successor in interest was mandated.

*See id.* at 695-696.

In connection with the *Blachana* inquiry, Moore relies on evidence and undisputed

allegations that GSI sold all of its assets and equipment to GAPCO shortly after ceasing business

operations, *see* C. Cutshall Decl., ¶ 7, that GAPCO is engaged in substantially the same business

as GSI was before it ceased its business operations, *see* Complaint, ¶ 12, that GSI and GAPCO

bear similar and related corporate names, *see* Complaint, ¶¶ 2-3, that GAPCO retained or

adopted GSI's contact information including both telephone numbers and email addresses after

acquiring GSI's assets, *see* Moore Decl. ¶¶ 22-25, and that GAPCO hired employees of GSI

following the asset purchase, *see id.*, ¶¶ 26-31. Under *Blachana*, this evidence is sufficient to

establish a *prima facie* case that GAPCO could be liable in connection with Moore's wage

claims, which under, *e.g.*, *Patin*, 294 F.3d at 653, is sufficient to establish a *prima facie* case that

GSI's Oregon-related contacts may be imputed to GAPCO.

Page 35 - FINDINGS AND RECOMMENDATION

As to whether Moore has made a *prima facie* showing that GAPCO could be GPI's successor for purposes of liability in connection with Moore's claims, I note that pursuant to 11 U.S.C. § 363(f), a debtor in chapter 11 bankruptcy proceedings may make a sale of assets outside the ordinary course of its business "free and clear" of any interest of any creditor or claimant of the debtor where:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such [creditor or claimant] consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  However, notwithstanding the foregoing, successor-in-interest liability to a creditor or claimant of a debtor may attach following such a sale under appropriate circumstances.  The effect of a free-and-clear sale order is complicated "by the fact that the recently created state law theory of successor liability . . . is simply inconsistent with more ancient federal bankruptcy principles based upon the sale of a debtor's assets to maximize the estate for creditors."  *In re Paris Industries Corp*, 132 B.R. 504, 509 n. 11 (D. Me. 1991), *citing In re White Motor Credit Corp.*, 75 B.R. 944, 950-51 (N.D. Ohio 1987); *see also Nelson v. Tiffany Indus., Inc.*, 778 F.2d 533 (9th Cir. 1985).  In addressing the issue of how to resolve future tort claims when administering a bankruptcy estate, most courts appear to have focused on the adequacy of the notice to future claimants that a Section 363(f) sale would take place.  *See In*

*re Savage Indus., Inc.*, 43 F3d 714, 720 (1st Cir. 1994) ("Notice is the cornerstone underpinning

Bankruptcy Code procedure."); *Schwinn Cycling & Fitness, Inc. v. Benonis*, 217 B.R. 790, 797

(N.D. Ill. 1997) (finding that claimants could not be enjoined from pursuing their state law

remedies when they were not provided any notice of, or the opportunity to participate in, the

bankruptcy court proceedings); *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 928-33 (Bankr.

W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr. WD. Tex. 1998) (a

bankruptcy court's order may extend to future claims if the claimant's interests received adequate

representation in the bankruptcy proceeding). It has been observed that "in all the cited opinions

that precluded successor liability claims against asset purchasers in bankruptcy, the claimants

were in front of the bankruptcy court during the bankruptcy proceedings, or the court found that

the claimants should have brought their claims during the bankruptcy proceedings." *In re Ninth

Avenue Remedial Group*, 195 B.R. 716,732 (N.D. Ind. 1996) (citing cases).

Here, there is no evidence that Moore was on notice of GPI's chapter 11 bankruptcy

proceedings, that Moore was listed as a known creditor of GPI at the time GAPCO purchased

GPI's assets, that Moore's claims against GPI were known to the bankruptcy court at the time it

issued its Authorization Order, or that Moore had received notice of GPI's motion for

authorization of the sale of assets to GAPCO. Because the bankruptcy court's order expressly

indicates that it is to be construed as binding as to "all known holders of any claim(s) against

[GPI]," Authorization Order, ¶ 6, and upon "all entities who received notice of [GPI's] Motion,"

and because in general courts require adequate notice of a Section 363(f) sale before assets

purchased pursuant to such a sale may be taken free and clear of the seller's liabilities, there

appear to be no good grounds for enforcing the Section 363(f) order so as to bar the attachment

Page 37 - FINDINGS AND RECOMMENDATION

of successor-in-interest liability to GAPCO.  In light of the evidence of record and allegations that GPI sold a portion of its assets and equipment to GAPCO, *see* Complaint, ¶ 12, that GAPCO is engaged in substantially the same business as GPI before it ceased business operations, *see* Complaint, ¶ 12, that GPI and GAPCO bear similar and related corporate names, *see* Complaint, ¶¶ 3, 11, that GAPCO retained or adopted GPI's contact information including both telephone numbers and email addresses after acquiring GPI's assets, *see* Moore Decl. ¶¶ 22-25, and that GAPCO hired employees of GPI following the asset purchase, *see id.*, ¶¶ 26-31, under *Blachana* Moore has made a *prima facie* showing that GAPCO could be liable to Moore under Oregon law in connection with GPI's failure to compensate him for his employment services.  Under *Patin*, 294 F.3d at 653, GAPCO's potential successor liability is sufficient to establish a *prima facie* case that GPI's constructive Oregon-related contacts may properly be imputed to GAPCO for jurisdictional purposes.

In light of Moore's *prima facie* showing that sufficient Oregon-directed conduct may properly be imputed to GAPCO, the personal jurisdictional burden shifts to GAPCO to present a compelling case that it would be unreasonable to hale it into court in Oregon.  GAPCO offers little argument or evidence toward meeting that burden.  I nevertheless consider the seven-factor reasonableness inquiry at the third prong of the specific personal jurisdiction test.

For the reasons discussed above in connection with the imputation of Oregon-related contacts to GAPCO, the first factor of the reasonableness inquiry – purposeful interjection – necessarily weighs in favor of finding that it would be reasonable to exercise personal jurisdiction over GAPCO in Oregon.  By contrast, the second factor – burden on the defendant – necessarily weighs to the contrary, in that GAPCO has no Oregon presence and would be

Page 38 - FINDINGS AND RECOMMENDATION

required to travel to litigate in this forum. As discussed above in connection with specific

personal jurisdiction over GSI, the third factor – conflict between Oregon and Texas sovereignty

– weighs in favor of personal jurisdiction here, in that an Oregon court would apply Oregon law

to the parties' dispute whereas the courts of other jurisdictions would be likely to apply Texas law

in accordance with the choice-of-law provision of Moore's Employment Contract. The fourth

factor – Oregon's interest in adjudicating the dispute – weighs in favor of exercising specific

personal jurisdiction here, as Oregon has a clear interest in vindicating the contractual rights of

its citizens. The fifth factor – the most efficient forum for disposition of the dispute – appears to

be largely a wash, as some witnesses and evidence are located in Oregon while others are not.

The sixth factor – inconvenience to the plaintiff of litigating in another forum – weighs in favor

of personal jurisdiction here, in that Moore has no connection to either Texas or Georgia.

Finally, the seventh factor – availability of an alternative forum – weighs against the exercise of

specific personal jurisdiction over GAPCO here, in that other fora are available for the litigation

of Moore's claims. The balance of factors favoring the exercise of personal jurisdiction here, I

find that GAPCO has not met its burden at the third prong of the specific personal jurisdiction

test.

For the foregoing reasons, Moore has successfully made a *prima facie* showing that this

court may properly exercise specific personal jurisdiction over GAPCO in Oregon, and in

consequence GAPCO's motion to dismiss for lack of personal jurisdiction should be

provisionally denied. GAPCO remains entitled to final determination of the specific personal

jurisdiction question either at a plenary evidentiary hearing or at trial.

## II.    Defendants' Motions to Dismiss for Lack of Venue and/or to Transfer Venue

As noted above, in the alternative to requesting dismissal for lack of jurisdiction, GAPCO

seeks dismissal of Moore's action for improper venue, whereas GSI and the Cutshalls move for

transfer of venue in the alternative to their motion to dismiss for lack of personal jurisdiction.  As

a general rule, "for the convenience of parties and witnesses, in the interest of justice, a district

court may transfer any civil action to any other district or division where it might have been

brought." 28 U.S.C. § 1404(a).

> A motion to transfer venue under § 1404(a) requires the court to weigh multiple
> factors in its determination whether transfer is appropriate in a particular case.
> For example, the court may consider: (1) the location where the relevant
> agreements were negotiated and executed, (2) the state that is most familiar with
> the governing law, (3) the plaintiff's choice of forum, (4) the respective parties'
> contacts with the forum, (5) the contacts relating to the plaintiff's cause of action
> in the chosen forum, (6) the differences in the costs of litigation in the two
> forums, (7) the availability of compulsory process to compel attendance of
> unwilling non-party witnesses, and (8) the ease of access to sources of proof.
> Additionally, the presence of a forum selection clause is a "significant factor" in
> the court's § 1404(a) analysis.

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 (9th Cir. 2000) (footnotes omitted).  The

defendant bears the burden of establishing the greater appropriateness of the transferee forum.

*See id.*  Courts afford a degree of deference to a plaintiff's choice of its home forum.  *See, e.g.,*

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).

Venue in federal court is generally governed by 28 U.S.C. § 1391.  *See* 28 U.S.C. §

1391(a).  However, in cases removed to federal court from state court, venue is no longer

governed by Section 1391, but rather by 28 U.S.C. § 1441(a).  *See Polizzi v. Cowles Magazines,*

*Inc.*, 345 U.S. 663, 665-666 (1953); *see also* 28 U.S.C. § 1441(a).  "This is because removal, if

proper, automatically satisfies federal venue requirements.  Under the removal statute, venue is

proper if removal is to the district in which the state action was pending and the federal court has

jurisdiction." *Skillnet Solutions, Inc. v. Entm't Publs, LLC*, Case No. C 11-4865 PSG, 2012 U.S.

Dist. LEXIS 28087, *12 (N.D. Cal. Mar. 2, 2012) (footnotes, citations omitted). Moreover,

"[t]his is true regardless of whether venue was proper in the state court to begin with." *Id.*

(footnotes, citations omitted). "A defendant who properly removes to federal court therefore

meets the venue requirements of § 1441, in effect canceling any improper venue objection under

Fed. R. Civ. P. 12(b)(3)." *Id.* (footnotes, citations omitted).

### A.    GAPCO's Motion to Dismiss for Improper Venue

Because all defendants actually or constructively consented to venue in this District when

they effected its removal, GAPCO's challenge to venue here is not well taken. *See* 28 U.S.C. §

1441(a). *see also Skillnet Solutions*, 2012 U.S. Dist. LEXIS 28087 at *12. GAPCO's alternative

motion to dismiss for improper venue should therefore be denied.

### B.    GSI and the Cutshalls' Motion to Transfer Venue

Analysis of the eight factors enumerated in *Jones* does not clearly compel the conclusion

that it would promote the convenience of the parties and witnesses or be in the interests of justice

to transfer this action to the Southern District of Texas. The Employment Contract was

negotiated and executed in both Oregon and Texas, such that the first factor – the location in

which the agreements were negotiated and executed – is effectively a wash. The second factor –

the forum with the greatest familiarity with governing law – is likewise a wash, in that this court

would apply Oregon law to the parties' dispute and would have greater familiarity with Oregon

law than would a court sitting in the Southern District of Texas, whereas the federal court for the

Southern District of Texas would most likely apply Texas law to the parties' dispute and would

have greater familiarity with Texas law than would this court. The third factor -- the plaintiff's choice of forum -- necessarily mitigates against transferring venue. The fourth and fifth factors -- the parties' contacts with the forum and their relationship to the causes of action asserted -- likewise mitigate against transferring venue, in that Moore resides in Oregon and his causes of action arose here, while all defendants over which this court may properly exercise specific personal jurisdiction by definition have minimally sufficient contacts with Oregon out of which Moore's claims arise. The sixth, seventh, and eighth factors -- the differences in the cost of litigation in Oregon and Texas, the availability of compulsory process in the two fora, and the ease of access to evidence -- are all likely to be a wash in that litigation in either forum would require one side, but not the other, to travel (other than defendant GAPCO, which would in any event be required to travel), and some witnesses and evidence are located in Oregon, some in Texas, and some elsewhere. In the absence of any compelling reason to transfer venue, GSI and the Cutshalls' motion to transfer venue should be denied.

## CONCLUSION

For the reasons set forth above, GAPCO's motion (#4) to dismiss should be denied in its entirety, defendants GSI and the Cutshalls' motion (#6-1) to dismiss for lack of personal jurisdiction should be denied as to GSI and granted as to the Cutshalls, defendants GSI and the Cutshalls' alternative motion (#6-2) to transfer venue should be denied, and Moore's claims should be dismissed without prejudice to the extent alleged against either or both of the Cutshalls.

///

///

Page 42 - FINDINGS AND RECOMMENDATION

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 29th day of November, 2016.

Honorable Paul Papak
United States Magistrate Judge

Page 43 - FINDINGS AND RECOMMENDATION